IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| LINDA WITHERRITE, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 200078R |
| | ) | |
| v. | ) | |
| | ) | |
| UMATILLA COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

Plaintiff appealed a Real Property Order from the Umatilla County Board of Property

Tax Appeals (BOPTA), dated March 6, 2020, for the 2019-20 tax year. A telephone trial was

held jointly on August 12, 2020, with *Garton and Associates Realtors, LLC v. Umatilla County

Assessor*, TC-MD 20077R. Linda Witherrite (Witherrite) appeared and testified on her own

behalf. Kalvin Garton (Garton) and Shane Garton also testified on behalf of Plaintiff. Douglas

Olsen, Umatilla County Counsel, appeared on behalf of Defendant. Clint Markle testified on

behalf of Defendant. Plaintiff's Exhibits 1 to 41, 45 to 51 and rebuttal Exhibits 43 to 44 were

received into evidence without objection. Defendant's Exhibits A and B were received into

evidence without objection.

## I. STATEMENT OF FACTS

The subject property is a one-story office building, approximately 60 years old, with a

main floor consisting of 3,910 square feet on a 4,791-square-foot lot. The subject property

(account 111386) is one half of a building; the other half is a separate tax lot and is identified in

the Garton appeal. Defendant's 2019-20 tax roll value for the subject property was $133,650.

That value was reduced by BOPTA to $80,960. Plaintiff requests the court reduce the value to

$45,000.

Garton testified he is retired as an accredited land consultant, was formally a fee appraiser for 18 years, and is currently a real estate agent. Garton listed the subject property and placed it on the Multiple Listing Service (MLS) in April 2018 for $135,000. (Ex 11.) Garton testified that after more than a year he only received a single offer, for the both sides of the building, for $82,500. The owner of the building signed a counteroffer for $85,000. (Ex 27.) Garton testified that the sale did not go through because the potential buyer was concerned about the cost of adding sidewalks. Garton testified that the property was in a probate proceeding and the attorney fees in that case were getting "too high." Witherrite saw the property listing advertisement, contacted Garton, and purchased the subject property for $45,000 cash, in November 2019. She testified that she had no prior relationship to Garton or to the owners of the property.

In October 2018 the City of Pendleton filed an affidavit for an administrative inspection warrant for premises at 611-615 SE Emigrant Avenue, Pendleton. The affidavit alleged the property was being used for multi-person residential occupancy, which was not an allowed use of the building. (Ex A at 30-31.) In October 2018, the city received a court approved Administrative Inspection Warrant. (Ex A at 33.) Garton met with city officials in October 2018 in his capacity as realtor and property manager, and advised them he was planning on putting 15 apartments into the building, but was told that the property would need permits and substantial modification for that use. (Ex A at 34-35.) In October 2019, the city inspected the building at 601, 603 and 605 SE Emigrant Avenue, and found residential use in violation of city and state codes. (Ex A at 39.) In late 2019, the city brought charges against Garton for unlawful use of the subject property. (Ex A at 45-47.)

Garton testified that the highest and best use of the subject property is as multi-family

residential units. He estimated it would cost $250,000 to add sidewalks, $50,000 to $60,000 to add sprinklers, plus other improvements, totaling approximately $400,000. Garton acknowledged that if used as a commercial property the owner would not have to put in sidewalks.

Garton selected 20 comparable sales of commercial properties for his analysis. Comparable 1 is the Garton property which sold in November 2019 also for $45,000. Garton adjustments netted zero change. Comparables 2 to 20 were commercial sites in the vicinity of the subject property, which Garton adjusted for square footage of the building(s) and lots, condition, and traffic count.[1] Garton testified that it was obvious that a higher traffic count would result in a greater property value and used his experience and intuition to determine those adjustments.

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2019-20 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor*, TC–MD 020869D, WL 21263620 at *2 (Or Tax M Div Mar 26, 2003) (internal quotation marks omitted). Real market value is defined in ORS 308.205(1)[2], which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The real market value of property "shall be determined by methods and procedures in accordance

---

[1] A detailed description of each of the comparables is not provided for the reasons set forth in the analysis section.

[2] References to the Oregon Revised Statutes (ORS) are to 2017.

with rules adopted by the Department of Revenue[.]" ORS 308.205(2). "The court looks for arm's length sale transactions of property similar in size, quality, age and location" to the subject property. *Richardson*, WL 21263620 at *3. "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arm's-length market transactions. When nontypical market conditions of sale are involved in a transaction (duress, death, foreclosures, interrelated corporations, or persons, etc.) the transaction will not be used in the sales comparison approach unless market-based adjustments can be made for the nontypical market condition." OAR 150–308–0240(2)(c). Plaintiff bears the burden of proof and must establish her case by a preponderance of the evidence. ORS 305.427. "[I]t is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.*, 310 Or. 260, 265, 798 P.2d 235 (1990). The assessment date for the 2019-20 tax year is January 1, 2019. ORS 308.007; ORS 308.210.

A.      *Plaintiff's and Garton's purchases*

Before analyzing Plaintiff's numerous comparable sales, the court considers whether the recent purchases by Garton and Witherrite represented arm's length transactions. "If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is very persuasive of the market value." *Kem v. Dept. of Rev.*, 267 Or. 111, 114, 514 P.2d 1335 (1973) (citations omitted).

The two factors in favor of a finding that the sale of the subject property represented an arm's length transaction, is the length of time the property was on the market, and Plaintiff's independence in locating and purchasing it. Plaintiff asserts that the recent purchase of the subject property and the purchase by Garton represented arm's length transactions and are indicative of its real market value because the properties were on the open market for more than 555 days and they paid more than the most recent failed offer. However, that may be offset by the fact the property was listed for $135,000, whereas Plaintiff's purchase was for one-third of that listed price. The factors indicating the sale was not an arm's length transaction are: 1) the owners are out of state and the property was in probate with Garton testifying that mounting attorney's fees were a motivating factor in quickly selling the property; 2) Garton was acting as the property manager and as the real estate agent; 3) Garton was being prosecuted for the way the property was being used; and 4) Garton loaned or invested money in the adjacent property and deducted those sums from the sales price. There is no indication that Garton or Witherrite had any improper motive related to the sale. But, objectively, the facts weigh decidedly against a finding that the purchase of the subject property represented an arm's length transaction. Thus, the court cannot rely upon that sale in determining the real market value of the subject property.[3]

Witherrite's purchase of the subject property was contemporaneous with Garton's. She persuasively testified that she saw the real estate advertising independently and had no previous

---

[3] Taxpayers often misunderstand the concept of "arm's length transaction" as an indication of integrity, honesty, or intent. Taxpayers often interpret a finding that sale of a property does not represent an arm's length transaction as an accusation of fraud or even criminal activity. Garton demonstrated that misunderstanding in a letter to Defendant where he stated: "I was terribly offended at the tax appeal hearing when your employee said that you did NOT consider this to be an arm's length deal. [Witherrite] and I actually paid the estate $7,500 more for this property than any other offers over the 555 days that the property was on the market though the Realtor's Multiple Listing Service." (Ex 30.) The court does not infer that Garton or Witherrite did anything wrong.

connections with the property or Garton. Yet, the analysis of the seller's side of the transaction is still a problem. Objectively the sellers were facing continuing legal fees in the probate estate and potential administrative or even criminal action pertaining to the property. Garton was both agent and an investor in the property. Under these facts the court cannot rely on Witherrite's purchase as an arm's length transaction.

B.      *Highest and best use of the property*

" 'Highest and best use' means the reasonably probable use of vacant land or an improved property that is legally permissible, physically possible, financially feasible, and maximally productive, which results in the highest real market value." OAR 150-308-0240(1)(e). "Determining highest and best use for the unit of property is necessary for establishing real market value." OAR 150-308-0240(1)(i).

Garton testified that the highest and best use of the subject property would be as a boarding house.[4] He indicated that the need in the community for low-cost housing was the primary factor in his opinion. However, Garton acknowledged that the city would not allow the subject property to be used as a boarding house in its present condition, indeed, he estimated it would cost about $400,000 to make the necessary changes, including adding sidewalks and sprinklers. Garton's selection of highest and best use was not legally permissible as determined by the city and his own admission, and considering the improvements required to convert the property were five times the roll value, that use was not financially feasible. When Garton selected properties as comparables and made adjustments, he appears to have used a highest and best use value as a boarding house. Repeatedly during his testimony, Garton asserted that

---

[4] This testimony was primarily about the Garton property. Garton's testimony was sparse as to the highest and best use of the Witherrite property. While Garton testified that the Witherrite property was purchased for a thrift shop, the comparables selected do not match that as the highest and best use.

sidewalks were an important element to the comparable properties that he selected and the adjustments he made. Garton's error in highest and best use selection skews his entire analysis.

Defendant opined the highest and best use of the property was as a commercial building. Accordingly, no sidewalks or sprinkler system would be necessary. Based on the pictures of the subject property, the comparables, and the properties' history, the court agrees that the highest and best use of the subject property is commercial — as an office building or retail.

C.    *Plaintiff's comparable sales*

Plaintiff presented twenty comparable sales adjusted for factors, such as square footage, condition, and traffic count. Comparable 1 is the Garton property. As explained above, the court does not view the sale as an arm's length transaction, and thus this sale should not be considered. Most of the comparables presented by Garton have unusually large adjustments. An extreme example of this is comparable 13, whose $440,000 sales price is adjusted downward for square footage and traffic count by $450,000 and then adjusted upward for condition by $200,000. Selecting properties necessitating adjustments this large, means they are not good comparable properties for establishing the real market value as the court has traditionally done. And while this comparable is extreme, the others in the group have adjustments so large, that they are unusable. Additionally, Garton adjusted for traffic count that he testified were based on his own intuition/guesses. While this court has considered traffic count adjustments in the past — they must be evidence based. Garton's testimony clearly demonstrated his knowledge of the market transactions in the area around the subject property, nevertheless, the court cannot reply upon his guesses for making traffic count adjustments.

Garton's comparable 4 appears to be commercial building of some type, but he offered scant other information. He presented a printout from the MLS showing a quit claim deed dated

March 2018, for about half the price it sold in December 2016.  No evidence was produced to verify the sale or explain why this was a quit claim instead of a general warranty deed. Comparable property 11 was a sale concluded more than one year after the assessment date without a time adjustment and was sold by an out of state probate estate.  No further information about that sale or adjustments was provided.  Neither of these sales assist the court in determining a real market value for the subject property.  The court finds that Plaintiff has failed to meet its burden of proof for the court to order a change in the real market value of the subject property.  Defendant's Answer requests the court to sustain the BOPTA decision.  Thus, it is unnecessary to analyze their evidence of value.

### III.  CONCLUSION

After careful consideration, the court concludes that Plaintiff has failed to meet her burden of persuasion.  Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied

_____

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed.  TCR-MD 19 B.*

*Some appeal deadlines were extended in response to the Covid-19 emergency. Additional information is available at <u>https://www.courts.oregon.gov/courts/tax</u>*

*This document was signed by Magistrate Richard Davis and entered on September 15, 2021.*